## IN THE UNITED STATE DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| UNITED STATE OF AMERICA | ) | |
| | ) | |
| vs. | ) | **Case No. 1:87-CR-00593** |
| | ) | |
| JORGE TORRES | ) | |
| VICTOR TORRES | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS JORGE AND VICTOR TORRES' MOTION FOR A SENTENCE REDUCTION PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)

**BELL NUNNALLY & MARTIN LLP**

By: /s/  Arianna Goodman
    Arianna Goodman
    agoodman@bellnunnally.com
    Texas Bar No. 24109938
    Jeff Ansley
    jansley@bellnunnally.com
    Texas Bar No. 00790235
    Katherine Devlin (pro hac pending)
    kdevlin@bellnunnally.com
    Texas Bar No. 24094372
    2323 Ross Avenue, Suite 1900
    Dallas, Texas 75201
    (214) 740-1400 Telephone

**BURIED ALIVE PROJECT**

By: /s/  Brittany Barnett
    Brittany K. Barnett (pro hac pending)
    brittany@buriedaliveproject.org
    Texas Bar No. 24078196
    3131 McKinney Avenue, Suite 600
    Dallas, Texas 75204
    (214) 919-4421 Telephone
    **ATTORNEYS FOR JORGE AND VICTOR TORRES**

## TABLE OF CONTENTS

I.    INTRODUCTION..............................................................................................1

II.   PERSONAL BACKGROUND ........................................................................3

III.  FACTUAL AND PROCEDURAL BACKGROUND ......................................7

      A.   Torres Brothers Offense Conduct............................................................7

      B.   Trial, Conviction and Sentencing .......................................................... 8

IV.   ARGUMENT..................................................................................................10

      A.   This Court Has the Authority to Reduce Jorge and Victor Torres'
           Sentence to Time Served Pursuant to 18 U.S.C. § 3582(c)(1)(A) ......10

           i.    Congress intended to empower district courts to reduce
                 sentences based on "extraordinary and compelling reasons"
                 other than medical condition, age, and family circumstances.................11

           ii.   The U.S. Sentencing Commission has indicated that the
                 "extraordinary and compelling reasons" upon which a
                 sentence reduction pursuant to 18 U.S.C. § 3582(c)(1)(A)
                 may be based are not limited to medical condition, age
                 and family circumstances........................................................14

           iii.  The First Step Act authorizes federal courts to reduce
                 sentences based on virtually any "extraordinary and
                 compelling reasons."...............................................................16

      B.   Jorge and Victor Torres Have Exhausted their Administrative
           Remedies for the Filing of an 18 U.S.C. § 3582(c)(1)(a) Sentence
           Reduction Motion Directly with this Court............................................21

      C.   Extraordinary and Compelling Reasons Support the Reduction
           of the Torres Brothers' Life Sentences to Time Served ......................21

           i.    The Torres Brothers are fully and unconditionally rehabilitated..............22

           ii.   The Torres Brothers are remorseful and accept full
                 responsibility for their actions. ..............................................23

           iii.  The Torres Brothers are pillars in the religious
                 community of BOP. ...............................................................24

           iv.   The Torres Brothers have acted in ways that far
                 exceed merely rehabilitating themselves....................................25

           v.    The Torres Brothers have exceptional character, even
                 in the opinion of BOP staff at FCI Fairton................................27

           vi.   The Torres Brothers are committed to working with
                 at-risk-youth. .......................................................................29

D.     The COVID-9 Outbreak Presents a Compelling and Extraordinary Circumstance that Warrants Compassionate Release for the Torres Brothers, Who are at Risk. ....................................................32

E.     The Conditions of BOP Incarceration Foster the Spread of COVID-19, and Jorge and Victor Torres' Age and Current Medical Conditions Render Them Particularly Susceptible to an Unreasonable Risk of Death and an Inability to Take Preventative Measures or Self-care Recommended by the CDC.............................................35

F.     The Relevant 3553(a) Factors Including the Torres Brothers' Release Plan Favor Resentencing. ....................................................40

       i.     The Torres Brothers have a realistic release plan that takes into account the time needed to transition back into society...................40

       ii.     Releasing the Torres Brothers does not diminish the seriousness of their offense.................................................41

       iii.     The Torres Brothers' advancing age and medical conditions favor their release especially in light of the ongoing COVID-19 pandemic.....................................................41

       iv.     The Torres Brothers' sentence is disproportionate to those of other large-scale conspiracy cases and to all of their former co-defendants........................................................42

       v.     After 33 years in prison, the sentencing goal of deterrence has been met.........................................................44

       vi.     There is nothing to gain with the continued incarceration of Jorge and Victor Torres....................................................46

V.     CONCLUSION.................................................................46

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Manrigue*,
   2020 WL 1307109 (N.D. Cal. Mar. 19, 2020) ...................................................................39

*In re Request to Commute or Suspend County Jail Sentences*,
   Docket No. 084230 (N.J. Mar. 22, 2020) ...........................................................................39

*United States v. Avenatti*,
   No. 8:19-cr-61 (C.D. Cal. Mar. 25, 2020) ..........................................................................39

*United States v. Barkman*,
   2020 U.S. Dist. LEXIS 45628 (D. Nev. Mar. 17, 2020) ......................................................39

*United States v. Beck*,
   Case No. 13-CR-186-6, 2019 WL 2716505 (W.D.N.C. June 28, 2019) .........................16, 18

*United States v. Cantu*,
   Case No. 05-CR-458, 2019 WL 2498923 (S.D. Tex. June 17, 2019) ....................................20

*United States v. Cantu-Rivera*,
   Case No. 89-CR-204, 2019 WL 2578272 (S.D. Tex. June 24, 2019) ...................................19

*United States v. Copeland*,
   No. 2:05-cr-135-DCN (D.S.C. Mar. 24, 2020) ...................................................................39

*United States v. Dimasi*,
   220 F. Supp. 3d 173 (D. Mass. 2016) ................................................................................15

*United States v Garlock*,
   No. 18-CR-00418-VC-1, 2020 WL 1439980 (N.D. Cal. Mar. 25, 2020) .............................39

*United States v. Harris*,
   No. 19-cr-356 (D.D.C. Mar. 26, 2020) ..............................................................................39

*United States v. Jaffee*,
   No. 19-cr-88 (D.D.C. Mar. 26, 2020) ................................................................................39

*United States v. Matthaei*,
   No. 1:19-CV-00243-BLW, 2020 WL 1443227 (D. Idaho Mar. 16, 2020) ...........................39

*United States v. McGraw*,
   Case No. 02-CR-00018, 2019 WL 2059488 (S.D. Ind. May 9, 2019) ..................................20

*United States v. Perez*,
   No. 19 CR. 297 (PAE), 2020 WL 1329225 (S.D.N.Y. Mar. 19, 2020) ..............................39

*United States v. Rodriguez*,
   2:03-cr-0027-AB-1 (E.D. Pa. April 1, 2020) ......................................................39

*United States v. Selna*,
   8:16-cr-76-JVS (C.D. Cal. Mar. 26, 2020) ........................................................39

*United States v. Stephens*,
   2020 WL 1295155, __F. Supp. 3d__ (S.D.N.Y. Mar. 19, 2020) ..........................................39

*United States. v. Torres*,
   901 F.2d 205 (2d Cir. 1990), cert. denied, 498 U.S. 906 (1990) ..........................................8, 9

*United States v. Torres*,
   941 F.2d 124 (2d Cir. 1991) ......................................................................9

*Xochihua-James v. Barr*,
   No. 18-71460 (9th Cir. Mar. 23, 2020) (unpublished)............................................38

**Statutes**

18 U.S.C. § 3553 ............................................................... 11, 18, 40, 41, 42

18 U.S.C. § 3582 ........................1, 3, 4, 1, 2, 3, 10, 11, 12, 13, 14, 15, 17, 18, 19, 20, 21, 37, 40

18 U.S.C. § 3582 ....................................................................17

18 U.S.C. § 4205 ....................................................................17

21 U.S.C. § 846 ....................................................................2, 8

21 U.S.C. § 848 ....................................................................2, 8

28 U.S.C. § 994 ..................................................................14, 16

42 U.S.C. § 247 ..................................................................34, 35

Pub. L. No. 116-136, § 12003(b)(2) (2020)........................................37

U.S.S.G. § 1B1.13 ....................................................11, 14, 15, 16, 18, 20

**Other Authorities**

ABA Journal, *How can prisons contain coronavirus when Purell is a contraband?*, (March 13, 2020), available at
https://www.abajournal.com/news/article/when-purell-is-contraband-how-can-prisons-contain-coronavirus ...................................................36

Biography, *Griselda Blanco Biography*, available at
http://www.biography.com/people/griselda-blanco-20965407 (last accessed June 24, 2018) ....................................................44

Bloomberg News, *Cuomo Orders 100% of Nonessential N.Y. Workforce to Stay Home,* (March 20, 2020), available at
https://www.bloomberg.com/news/articles/2020-03-20/n-y-gov-cuomo-100-percent-of-workforce-must-stay-home ...................................................34

Bureau of Prisons, *Federal Bureau of Prisons Covid19 Action Plan*, available at
https://www.bop.gov/resources/news/20200313_covid-19.jsp; ...................................................35

Cardozo Law Review, *Second Looks & Second Chances* (forthcoming 2019) (available today at
https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3404899) ...................................................12

CBS 4 Miami, *The Hunt for the 'Cocaine Godmother,* (Sept. 27, 2012), available at http://miami.cbslocal.com/2012/09/27/the-hunt-for-the-cocaine-godmother/ (last accessed June 24, 2018)...................................................43, 44

CBS 5 SF BayArea, *Notorious Ex-Cocaine Kingpin George Jung Out of Prison, Living in San Francisco,* (June 3, 2014), available at
http://sanfrancisco.cbslocal.com/2014/06/03/notorious- ...................................................43

Centers for Disease Control and Prevention, *People who are at higher risk for severe illness,* (March 26, 2020), available at
https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fspecific-groups%2Fhigh-risk-complications.html ...................................................35

Congressional Research Service, *Federal Prisoners and COVID-19: Background and Authorities to Grant Release*,
https://www.politico.com/f/?id=00000171-1826-d4a1-ad77-fda671420000 ...................................................37

Federal Bureau of Investigation, *Last of the Arellano-Felix Brothers Sentenced*, (Aug. 19, 2013), available at https://www.fbi.gov/sandiego/press-releases/2013/last-of-the-arellano-felix-brothers-sentenced (last accessed March 27, 2020) ...................................................42, 43

Federal Bureau of Investigation, *Osiel Cardenas-Guillen, Former Head of the Gulf Cartel, Sentenced to 25 Years' Imprisonment,* (Feb. 24, 2010), available at https://www.fbi.gov/houston/press-_releases/2010/ho022410b.htm (last accessed June 24, 2018) ...........................................................................43

Gonsalves, et al., *Achieving a Fair and Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States,* (March 2, 2020), at https://bit.ly/2W9V6oS ....................................................36

National Public Radio, *Fauci Estimates that 100,000 to 200,000 Americans Could Die From the Coronavirus,* (Mar. 29, 2020), https://www.npr.org/sections/coronavirus-live-updates/2020/03/29/823517467/fauci-estimates-that-100-000-to-200-000-americans-could-die-from-the-coronavirus ........................................33

National Public Radio, *How the Novel Coronavirus and the Flu are Alike and Different,* (Mar. 20, 2020), https://www.npr.org/sections/goatsandsoda/2020/03/20/815408287/how-the-novel-coronavirus-and-the-flue-are-alike-and-different ....................................33

National Public Radio, *Prisons and Jails Worry About Becoming Coronavirus 'Incubators,'* (March 13, 2020), available at https://www.npr.org/2020/03/13/815002735/prisons-and-jails-worry-about-becoming-coronavirus-incubators ..................................................36

The New York Times, *Coronavirus Map: Tracking the Global Outbreak,* (March 25, 2020), available at https://www.nytimes.com/interactive/2020/world/coronavirus-maps.html?action=click&pgtype=Article&state=default&module=styln-coronavirus&variant=show&region=TOP_BANNER&context=storyline_menu?action=click&pgtype=Article&state=default&module=styln-coronavirus&variant=show&region=TOP_BANNER&context=storyline_menu ..............................................................................32, 33, 34

The New York Times, *White House Takes New Line After Dire Report on Death Toll*, (March 17, 2020), available at https://www.nytimes.com/2020/03/17/us/coronavirus-fatality-rate-white-house.html?action=click&module=Spotlight&pgtype=Homepage ......................34

The New York Times, *White House Tells Travelers from New York to Isolate as City Cases Soar*, (March 24, 2020), available at https://www.nytimes.com/2020/03/24/nyregion/coronavirus-new-york-update.html ..................................................................................36

Oxford University Press, *Infection Control in Jails and Prisons, Clinical Infectious Diseases* 45(8) (2007), available at https://doi.org/10.1086/521910 ...................35

Politico New York Health Care, *New York becomes 'epicenter' of coronacirus pandemic,* (March 25, 2020), available at https://www.politico.com/states/new-york/newsletters/politico-new-york-health-care/2020/03/25/new-york-becomes-epicenter-of-coronavirus-pandemic-333669 ...................................................................................33

Prison Policy Initiative, *No need to wait for pandemics: The public health case for criminal justice reform,* (March 6, 2020), available at https://www.prisonpolicy.org/blog/2020/03/06/pandemic ...................................................37

Senate Report No. 98-225 (1983) .........................................................................12

U.S. Department of Justice, Federal Bureau of Prisons, *Compassionate Release/Reduction in Sentence:  Procedures for Implementaion of 18 U.S.C. §§ 3582(c)(1)(A) and 4205(g),* available at https://www.bop.gov/policy/progstat/5050_049_CN-1.pdf .................................17

The Verge, *Prisons and jails are vulerable to COVID-19 outbreaks,* (Mar. 7, 2020), available at https://bit.ly/2TNcNZY .......................................................37

The White House, *Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak,* (March 13, 2020), available at https://www.whitehouse.gov/presidential-actions/proclemation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/ ...................................................................................................34

World Health Organization, *Report of the WHO-China Joint Mission on Coronavirus Disease 2019 (COVID-19),* https://www.who.int./docs/default-source/coronaviruse/who-china-joint-mission-on-covid-19-final-report.pdf .......................38

World Health Organization, *WHO Director-General's opening remarks at the media briefing on COVID-19,* (March 11, 2020), available at https://bit.ly/2W8dwpS ........................................................................................32

Jorge and Victor Torres ("Jorge" or "Victor" collectively, "Torres Brothers") respectfully submit this memorandum of law in support of their motion, pursuant to 18 U.S.C. § 3582(c)(1)(A), for entry of an Order reducing their life sentences, of which they have already served nearly 33 years, to time served.[1]

## I.   INTRODUCTION

Two weeks ago, this brief would have primarily focused on the story of the Torres Brothers, from 1988 to the present. In that time, they have made successful, unparalleled efforts to rehabilitate themselves, build relationships with their children and grandchildren, and give back to the prison community and community at large through their efforts to prevent others from making their same mistakes. However, given the recent, unprecedented and ongoing health pandemic, it is imperative to also stress the current life-threatening danger lurking at the prison cell doors of Jorge and Victor Torres. Now, more than ever, the Torres Brothers are worthy of a second chance. Their lives could very well depend on it.[2]

In sentencing the Torres Brother in 1988, the Court did not intend to give them a death sentence. However, amidst the ongoing pandemic, that is essentially the case. The Torres Brothers have done everything right since day one of their incarceration – June 24, 1987. Their post-incarceration actions, their age and current medical conditions, and their reentry plan, coupled with the unparalleled health crisis sweeping our country and its deadly expected arrival in our prisons, are, by all meaning of the words, "extraordinary and compelling."

---

[1] Jorge and Victor Torres have been in custody since June 24, 1987 – a total of 393 months (almost 33 years), which is equivalent to more than 450 months (37.5 years) imprisonment once "good time" credit is taken into account.

[2] *See generally*, Exhibit 1, Affidavit of Dr. Brie Williams.

At the time of their sentencing, Jorge and Victor Torres were 29 and 25, respectively. They were convicted of Conspiracy to Distribute Heroin, in violation of 21 U.S.C. § 846, and Conducting a Continuing Criminal Enterprise, in violation of 21 U.S.C. §§ 848(a) and 848(b). The Honorable John M. Walker, Jr. sentenced both men to life in prison. Since then, Judge Walker has drastically changed his position on the appropriate sentence for the Torres Brothers. He strongly believes they should be released.[3]

> In sum, in my view, the Torres' continued incarceration is not necessary to serve the needs of our criminal sentencing scheme. *See* 18 U.S.C. § 3553(2). In the more than 32 years on the bench, this is the first time that I have supported a commutation. But it is the first time that I have encountered individuals whom I have sentenced that have rehabilitated themselves so completely and have rejected their criminal pasts so resoundingly.[4]

Changes to 18 U.S.C. § 3582(c)(1)(A) contained in the First Step Act, signed into law on December 21, 2018, authorizes courts, after a defendant has exhausted his administrative remedies, to reduce the prison term – even to time served – of any defendant if it finds that "extraordinary and compelling reasons" warrant a reduction. In other words, federal judges are now empowered to take a "second look" at the sentences imposed on defendants who are deserving and worthy of said "second look." Judge Walker has taken a second look and fully supports a time-served sentence for Jorge and Victor.[5] Judge Walker made his support of a time-served sentence for the Torres Brothers known long before the ongoing health pandemic. The Torres Brothers are respectfully asking that this Honorable Court find the same.

---

[3] *See* Exhibit 2, Letters from U.S. Circuit Judge John M. Walker, Jr. to the Office of the Pardon Attorney dated January 6, 2017 and March 23, 2018.

[4] *See id*. at 4.

[5] *See id*.

Jorge and Victor Torres – non-violent  offenders, who are serving their 33rd year of a life sentence – are deserving and worthy of a "second look."  And, as set forth below, "extraordinary and compelling  reasons" warrant reduction of their life sentences to time served.  Accordingly, and for all the reasons detailed  below, we respectfully  request that this Court enter an Order, pursuant to 18 U.S.C. § 3582(c)(1)(A), reducing Jorge Torres' and Victor Torres' life sentences to time served.

## II.   PERSONAL BACKGROUND

Jorge and Victor Torres were born in Guayama, Puerto Rico, the eighth and tenth of ten children, respectively. The brothers  were raised in a close-knit, economically-comfortable  family supported by their father's earnings as a landscaper.[6]  The family  relocated to New York for their father's employment,  and they remained in New York for roughly thirteen years before returning to Puerto Rico.[7]

After graduating  high  school  in  New  York,  Jorge  enlisted  in  the  United  States  Navy  in 1976,  where he served this  country  until  he was honorably  discharged  four years later.[8]  Victor finished  high school in Puerto Rico and returned to New York after graduation.[9]  He then worked as a handyman.[10]

---

[6] *See* Exhibit  3, Jorge Torres  Presentence Report ("Jorge PSR") at 2; *see also* Exhibit  4, Victor Torres Presentence Report ("Victor PSR") at 2.

[7] *See* Exhibit  3, Jorge PSR at 2-3.

[8] *See id.* at 5.

[9] *See* Exhibit  4, Victor PSR at 2.

[10] *See id.* at 3.

---

With the exception of one brother, Urbano, the Torres Brothers' siblings had no conflicts with the law.[11] Urbano was convicted for Possession of Cocaine in 1986 or 1987 and passed away shortly thereafter.[12]

In 1981, Jorge married the former Iris Rosario in a religious ceremony in New York, and the couple have three children together: Jorge Jr., Blanca, and Mayling.[13] Still today, Iris describes Jorge as a good father, husband, and family man who has maintained contact with his children and advised them to "do the right and honest things in life."[14] Iris is still just as dedicated to and supportive of Jorge as she was when they were first married almost forty years ago.

Jorge's wife and daughters all describe a strong relationship with Jorge. Despite being in prison for most of Blanca and Mayling's lives, he has a strong relationship with them and their children, calls and writes regularly, and has played a vital role in their lives and who they have become. Blanca has an Associates' Degree in Business, has two kids, and works as the Vice President of Operations for a property management company. Mayling has an Associates' Degree in Optic Dispensing, has three kids, and is an account manager for ADT Security. Jorge Jr. lives in California with his wife and three children and works for Porsche. All of his kids are successfully contributing to society, and they attribute most of their success to learning from their father's dedication to be better each day.

---

[11] *See id.*; Exhibit 3, Jorge PSR at 3.

[12] *Id.*

[13] *See* Exhibit 3, Jorge PSR at 3.

[14] *See* Exhibit 5, Jorge family support letters at 3; *see also* Exhibit 3, Jorge PSR at 3-4.

---

Victor married Lourdes Padro-Vasquez in New York, and the couple have three children together: Victor Jr., Urbano, and Lounelly.[15]  Victor, like his brother, maintains a close relationship with his children.   Victor Jr. lives in Maryland with his wife and three kids, and he works as a supervisory border patrol agent.  Lounelly lives with her husband and four stepchildren, and she works as a transportation security specialist for TSA.  Urbano suffers from Fragile X Syndrome, and he currently lives in Puerto Rico with his mother and stepfather.  Victor's counsel spoke with Victor Jr. and Lounelly at great length and witnessed firsthand the pivotal role Victor has played, and continues to play, in their lives.  He calls weekly and interacts with his grandchildren.

As adults, Lounelly and Victor Jr. recognize that their relationship with their father is due solely to his efforts while incarcerated.  While they have never been ashamed of who he is, they describe feelings of being "beyond proud" of who he has become.  As described by Chief U.S. Probation Officer Michael J. Luciano, and as evidenced by the numerous support letters submitted to the court in 2013 and 2014 as part of a Rule 35 motion and again to this motion, "Mr. Torres' family is intensely loyal and supportive of him."[16]

Jorge and Victor were very close with their father until his passing.[17]  Their mother will be 97 years old in June, and of her five sons, three have passed away and two, Jorge and Victor, are incarcerated. Due to her age and the ongoing pandemic plaguing our society today, she cannot even visit her two sons in prison.  She has expressed her fervent wish to see Jorge and Victor released from prison during her lifetime.  Very likely, the only way Jorge and Victor will ever see

---

[15] *See* Exhibit 4, Victor PSR at 3.

[16] Exhibit 5, Jorge support letters; *see also* Exhibit 6, Victor family support letters.

[17] *See also* Exhibit 3, Jorge PSR at 3; Exhibit 4, Victor PSR at 3.

their mother again is if this Court determines a sentence of time-served is sufficient for the Torres Brothers.

If this Honorable Court orders a reduction in Jorge and Victor's life sentences to time served, they are prepared with a reentry plan.[18] During their incarceration, even with the understanding that they were serving life sentences and would never be released, the Torres Brothers have consistently worked on bettering themselves and learning various life skills that will allow them to contribute to society as productive, law-abiding citizens.[19] Further, if released, the two men will live with family in Philadelphia, Pennsylvania.[20] They both have tremendous work ethics and have learned invaluable skills while incarcerated which will position them both for various options for gainful employment upon release. They are both eager to begin working and helping support those who have supported them for the past 33 years. They understand society, technology, and the ways of the world have changed during their incarceration. They have the support of many people who have vowed to do whatever necessary to help the Torres Brothers adapt to living outside of prison walls – for the first time in nearly 33 years. While they are transitioning, the Torres Brothers intend to spend time with their mother, their children, and their grandchildren.

---

[18] *See* Exhibit 7, Jorge Reentry Plan; *see also* Exhibit 8, Victor Reentry Plan.

[19] *See* Exhibit 7, Jorge Reentry Plan; *see also* Exhibit 8, Victor Reentry Plan.

[20] *See* Exhibit 7, Jorge Reentry Plan; *see also* Exhibit 8, Victor Reentry Plan.

### III.   FACTUAL AND PROCEDURAL BACKGROUND

A.   <u>Torres Brothers Offense Conduct.</u>

In the early 1980s, Jorge and Victor, then in their early twenties, became involved in a conspiracy to distribute heroin.[21] This was a street level, large-scale heroin distribution network that operated primarily out of South Bronx and generated large sums of money. While expansive, it was never affiliated with any established gang network. Through this conspiracy, Jorge and Victor acquired business and real estate holdings in Puerto Rico.[22] At the time of his arrest in 1987, at 29 years old, Jorge was self-employed, doing business as Torres, Inc., a real estate operation, and an owner of a shopping mall in Puerto Rico. He was also part owner of three independent gas stations.[23] Victor, 25 years old, worked in family-owned or privately owned businesses.[24] These businesses and real estate operations were initially started with money that the young men acquired unlawfully through their criminal enterprise. As the years went on, the Torres Brothers shifted their attention from the criminal enterprise to the businesses they built in Puerto Rico, and in 1986 the two men left the day-to-day management of the heroin conspiracy to co-defendant Nelson Flores.[25]

The police arrested the Torres Brothers in June 1987.[26] They immediately regretted their decision and have continued to regret it every day since then. However, they have used that regret

---

[21] *See* Exhibit 3, Jorge PSR at 21; Exhibit 4, Victor PSR at 18.

[22] *See* Exhibit 3, Jorge PSR at 23; Exhibit 4, Victor PSR at 20.

[23] *See* Exhibit 3, Jorge PSR at 4.

[24] *See* Exhibit 4, Victor PSR at 3-4.

[25] *Id.* at 24.

[26] *See* Exhibit 3, Jorge PSR; Exhibit 4, Victor PSR.

to better themselves and to educate their family and the community on how to not make the same mistakes they made, and they will continue to do so if released.

      B.      <u>Trial, Conviction and Sentencing.</u>

      Jorge and Victor were indicted on July 9, 1987, in the Southern District of New York (Case No. S87-CR-00593). The government filed a superseding indictment on January 21, 1988. On July 6, 1988, the Torres Brothers were convicted by a jury of, *inter alia*, Conspiracy to Distribute Heroin in violation of 21 U.S.C. § 846 and Conducting a Continuing Criminal Enterprise in violation of 21 U.S.C. §§ 848(a) and 848(b).[27] Section 848(b), known as the "kingpin" provision, which was added to the statute only four years earlier, mandated a sentence of life imprisonment without parole. In 1988, Judge Walker sentenced both men to life in prison without the possibility of parole pursuant to the kingpin statute.

      Section 848(b) requires the imposition of a life sentence for a defendant convicted under 848(a) only if additional conditions contained in subsection (b) are satisfied.[28] In the Second Circuit, section 848(b) is a separate offense from the offense under section 848(a), and its elements must be proven beyond a reasonable doubt. An offense under section 848(a) is considered a lesser-included offense to the offense under section 848(b).[29] Importantly, a sentence of life imprisonment without parole is mandated under section 848(b), but merely *permitted* under section 848(a).[30]

---

[27] *See United States. v. Torres*, 901 F.2d 205, 213 (2d Cir. 1990) (listing the convictions and sentences), cert. denied, 498 U.S. 906 (1990).

[28] *See Torres*, 901 F.2d at 224.

[29] *Id.* at 241.

[30] *See, e.g., Torres*, 901 F.2d at 224 ("Section 848(a) *permits* the imposition of a life sentence upon a defendant convicted of its violation. Section 848(b) *requires* the imposition of a life sentence

After the Torres Brothers were convicted, the Second Circuit found that improper jury instructions were given as to the section 848(b) charge.[31] The Torres Brothers' convictions were accordingly vacated and remanded with instructions to re-sentence under section 848(a), which does not mandate life imprisonment without parole. However, on October 22, 1990, Judge Walker again sentenced the Torres Brothers to life imprisonment without parole.[32] He appeared, however, to struggle with the decision, making comments that indicated he thought the two men were remorseful:

> I am quite confident in my own mind that both Jorge and Victor Torres have a different mindset today than they did when the sentence was originally imposed…They are, through force of character I believe, committed to trying to conduct themselves in prison in a way that is meaningful and is in accordance with their religious convictions. [33]

The Torres Brothers appealed these new sentences on Eighth Amendment grounds, but the Second Circuit affirmed the sentences against those specific challenges.[34] The Torres Brothers brought a number of challenges to their convictions and sentences over the course of their nearly 33 years of incarceration, but none have been successful. Jorge and Victor's application for executive clemency was denied in 2017. This motion is their last chance.

---

upon a defendant convicted under Section 848(a) if, in addition, the requirements of subsection (b) are satisfied.") (emphasis in original).

[31] *Id.*

[32] *See* Exhibit 9, Transcript of 10/22/90 Sentencing.

[33] *See id.* at 23:2-4, 25:6-9.

[34] *United States v. Torres*, 941 F.2d 124, 127–28 (2d Cir. 1991).

## IV.   ARGUMENT

Jorge and Victor Torres do not dispute that their offense was decidedly serious.  Although this was Jorge's first offense and Victor had only one prior arrest, which was later expunged, and did not engage in any acts of violence, they did operate a large-scale heroin distribution when drugs were running rampant and wreaking havoc in New York City.  Still, today – nearly 33 years later – the Torres Brothers are deserving of a "second look" and a reduced sentence.  As detailed below, this Court is now authorized to take such a "second look" and empowered to reduce Jorge and Victor Torres' sentences, even to time served.

A.   This Court Has the Authority to Reduce Jorge and Victor Torres' Sentence to Time Served Pursuant to 18 U.S.C. § 3582(c)(1)(A).

With the changes to 18 U.S.C. § 3582(c)(1)(A) contained in the First Step Act, district courts no longer need await a motion from the Director of the Bureau of Prisons ("BOP") before reducing a defendant's sentence, even to time served, based on the existence of "extraordinary and compelling" circumstances.  Rather, district courts may now do so directly upon the filing of a motion by a defendant after the earlier of two events: (1) rejection by the warden of the facility in which a defendant is being held of a request for an 18 U.S.C. § 3582(c)(1)(A) sentence reduction motion; or (2) the lapse of 30 days from the receipt of such a request by the warden of such facility.

Moreover, the "extraordinary and compelling reasons" upon which district courts may reduce a sentence are no longer limited to medical condition, age, and family circumstances.  There are no limits as to the "extraordinary and compelling reasons" that might warrant a sentence reduction pursuant to 18 U.S.C. § 3582(c)(1)(A).  Therefore, this Court is free to determine on its own whether "extraordinary and compelling reasons" exist that warrant a reduction of the Torres Brothers' life sentences to time served or otherwise, and then free to decide what relief to give them under the statute.  The Torres Brothers' post-incarceration conduct, their age, medical

conditions, and the unprecedented ongoing pandemic are all "extraordinary and compelling reasons" justifying a sentence reduction to time-served for the Torres Brothers.

Once a defendant files an 18 U.S.C. § 3582(c)(1)(A) sentence reduction motion, a district court may reduce that defendant's sentence to time served if it finds that: (1) "extraordinary and compelling reasons" exist for a sentence reduction after considering the 18 U.S.C. § 3553(a) factors; and (2) a reduced prison term is consistent with the applicable policy statements set forth in Section 1B1.13 of the Guidelines. According to 18 U.S.C. § 3553(a)(2), the four purposes of sentencing are retribution, deterrence, incapacitation, and rehabilitation. As more fully discussed below, none of these sentencing goals are served by the continued incarceration of the Torres Brothers. They have successfully deterred their children, at-risk youth, and other incarcerated individuals from engaging in criminal activity. This fact, in conjunction with the rehabilitation and efforts made by the Torres Brothers detailed below, warrant "extraordinary and compelling reasons" for a sentence reduction.

   i. *Congress intended to empower district courts to reduce sentences based on "extraordinary and compelling reasons" other than medical condition, age, and family circumstances.*

Congress first enacted the modern form of the "compassionate release" appearing in 18 U.S.C. § 3582 as part of the Comprehensive Crime Control Act of 1984. That legislation included, among other things, the major sentencing reforms reflected in the Sentencing Reform Act of 1984, including the abolition of parole and the implementation of the Guidelines, which combined to ensure that most defendants would serve, in full, the terms of imprisonment imposed on them at initial sentencing (save for limited "good-time" credit). Recognizing that the abolition of parole would eliminate the criminal justice system's means for adjusting to changed circumstances,

Congress created a number of statutory sentence adjustment provisions, which are collectively codified in 18 U.S.C. § 3582(c).[35]

As relevant here, 18 U.S.C. § 3582(c)(1)(A) provides that district courts can modify a "final term of imprisonment" if "extraordinary and compelling reasons warrant such a reduction." Three points bear noting with regard to the operation of 18 U.S.C. § 3582(c)(1)(A).

First, Congress empowered district courts, not the U.S. Parole Commission, to decide in individual cases if "there is a justification for reducing a term of imprisonment."[36] Put differently, Congress envisioned 18 U.S.C. § 3582(c)(1)(A) acting as a "safety valve[] for [the] modification of sentences," and intended for district courts to be able to reduce sentences when justified by the various factors and reasons that the U.S. Parole Commission previously considered in making parole determinations.[37] Lawmakers further noted that the foregoing approach would keep "the sentencing power in the judiciary where it belongs," rather than with the U.S. Parole Commission, and that 18 U.S.C. § 3582(c)(1)(A) would allow for the "later review of sentences in particularly compelling situations."[38] This legislative history demonstrates that Congress, in passing the Comprehensive Crime Control Act of 1984, intended to give district courts an equitable power to, on an individualized basis, correct sentences when "extraordinary and compelling reasons" indicate that the original sentence imposed on any individual defendant no longer serves legislative objectives.

---

[35] *See generally* Shon Hopwood, *Second Looks & Second Chances*, Cardozo Law Review (available today at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3404899).

[36] *See* S. Rep. No. 98-225, at 56 (1983).

[37] *Id.* at 121.

[38] *Id.*

---

Second, although the power to reduce sentences provided for by 18 U.S.C. § 3582(c)(1)(A) has most often been used to reduce the prison terms of elderly and/or terminally ill defendants, nothing in the statutory language or legislative history of 18 U.S.C. § 3582(c) indicates that Congress intended to limit its application to elderly defendants or defendants with compelling medical circumstances. Rather, if a judge finds the existence of any "extraordinary and compelling reasons" warranting a sentence reduction, those reasons could, pursuant to 18 U.S.C. § 3582(c)(1)(A), form the legal basis for the reduction "of an unusually long sentence."[39] Indeed, the legislative history of 18 U.S.C. § 3582(c)(1)(A) indicates that lawmakers thought that "extraordinary and compelling reasons" for a sentence reduction should not be limited to medical condition, age, and family circumstances. In particular, recognizing that parole had historically played a key role in the federal criminal justice system, legislators explained how some defendants may warrant a sentence reduction, after service of some period of incarceration, based on any number of "circumstances":

> The [Senate Judiciary] Committee believes that there may be unusual cases in which an eventual reduction in the length of a term of imprisonment is justified by changed circumstances. These would include cases of severe illness, *cases in which other extraordinary and compelling circumstances justify a reduction of an unusually long sentence*, and some cases in which the sentencing guidelines for the offense of which the defendant was convicted have been later amended to provide a shorter term of imprisonment.[40]

Third, notwithstanding all of the foregoing, Congress conditioned the reduction of any "final term of imprisonment" pursuant to 18 U.S.C. § 3582(c)(1)(A) on the filing of a motion by the Director of the BOP requesting such a reduction. Thus, district courts – until the recently

---

[39] *Id*. at 55-56.

[40] *Id*. at 55-56 (1983) (emphasis added).

enacted First Step Act – were only authorized to reduce a sentence based on "extraordinary and compelling reasons" if asked to do so by the Director of the BOP. Finally, the district courts have the authority to authorize a reduced sentence after rejection by the warden or a 30-day lapse in response from the warden.

ii. *The U.S. Sentencing Commission has indicated that the "extraordinary and compelling reasons" upon which a sentence reduction pursuant to 18 U.S.C. § 3582(c)(1)(A) may be based are not limited to medical condition, age, and family circumstances.*

In enacting the Comprehensive Crime Control Act of 1984, Congress tasked the United States Sentencing Commission ("Sentencing Commission") with the responsibility of developing standards to identify the existence of "extraordinary and compelling reasons" that warrant a sentence reduction.[41] However, the Sentencing Commission initially neglected that legislatively mandated obligation. In 2007, the Sentencing Commission finally acted, promulgating a policy statement advising that "extraordinary and compelling reasons" warranting a sentence reduction could include medical condition, age, family circumstances, and "other reasons."[42]

Notwithstanding the foregoing, in April 2013, the Office of the Inspector General of the U.S. Department of Justice ("OIG") issued a scathing report finding that the Director of the BOP rarely filed 18 U.S.C. § 3582(c)(1)(A) sentence reduction motions, even for defendants who clearly met the Sentencing Commission's objective criteria for a sentence reduction.[43] In response, the Sentencing Commission expanded its guidance to district courts on qualifying circumstances and

---

[41] *See* 28 U.S.C. § 994(t) ("The Commission . . . shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples").

[42] *See* U.S.S.G. § 1B1.13, Application Note 1(A) (Amendment 698).

[43] *See* Exhibit 10, U.S. Dep't of Justice Office of the Inspector General, The Federal Bureau of Prisons' Compassionate Release Program (Apr. 2013).

encouraged the BOP to file 18 U.S.C. § 3582(c)(1)(A) motions whenever a defendant met the criteria set forth in Section 1B1.13 of the Guidelines.[44]   In doing so, the Sentencing Commission identified several categories that qualify as "extraordinary and compelling reasons," including medical condition, age, family circumstances, and "[o]ther reasons, for circumstances in which the Director of the BOP determines that there is an extraordinary and compelling reason other than, or in combination with," medical condition, age, and family circumstances.[45]   The Sentencing Commission also clarified that "extraordinary and compelling reasons" need "not have been unforeseen at the time of sentencing in order to warrant" a sentence reduction.[46]   In other words, an "extraordinary and compelling" reason for a sentence reduction that could have been known or anticipated by a district court at the time of initial sentencing "does not preclude [its] consideration" for a sentence reduction.[47]

Thus, simply put, the Sentencing Commission, consistent with the text and legislative history of 18 U.S.C. § 3582(c)(1)(A), concluded that reasons beyond medical condition, age, and family circumstances could constitute "extraordinary and compelling reasons" for a sentence reduction, and those "extraordinary and compelling reasons" need not necessarily relate to a defendant's circumstances after sentencing.

Additionally, Congress set forth only one limitation when it delegated authority to the Sentencing Commission to develop standards for identifying "extraordinary and compelling

---

[44] *See* U.S.S.G. § 1B1.13, Application Note 4; *United States v. Dimasi*, 220 F. Supp. 3d 173, 175 (D. Mass. 2016) (discussing the progression from the OIG report to new "encouraging" guidelines).

[45] U.S.S.G. § 1B1.13, Application Note 1(A) (internal quotation marks omitted).

[46] *Id.*, Application Note 2.

[47] *Id.*

reasons" for a sentence reduction: "Rehabilitation of the defendant <u>alone</u> shall not be considered an extraordinary and compelling reason."[48] There is no doubt that lawmakers legislated that sole limitation so that district courts would not use a defendant's rehabilitation, standing alone, as a basis for a sentence reduction, thereby creating a direct substitute for the parole system that Congress abolished when it passed the Comprehensive Crime Control Act of 1984. Importantly, legislators' use of the modifier "alone" evidences that they believed that rehabilitation **is relevant** to the question of whether a sentence should be reduced and that rehabilitation, when considered together with other equitable factors, could constitute "extraordinary and compelling reasons" for a sentence reduction.

   iii.   *The First Step Act authorizes federal courts to reduce sentences based on virtually any "extraordinary and compelling reasons."*

As detailed above, district courts, before the First Step Act, could only reduce a defendant's sentence if the Director of the BOP filed a motion before the district court requesting such relief.[49] In other words, district courts had no authority before the First Step Act, absent the rare filing of a motion by the Director of the BOP, to reduce the sentence of any defendant, even if a defendant unambiguously presented "extraordinary and compelling reasons" for a sentence reduction (either as determined by a judge or as defined by the Sentencing Commission in Section 1B1.13 of the Guidelines).

Thus, practically speaking, the Director of the BOP was unilaterally empowered to determine which defendants presented "extraordinary and compelling reasons" for a sentence

---

[48] 28 U.S.C. § 994(t) (emphasis added).

[49] *See United States v. Beck*, Case No. 13-CR-186-6, 2019 WL 2716505, at *4 (W.D.N.C. June 28, 2019) ("Before passage of the First Step Act of 2018, district courts could grant compassionate release sentence reductions only upon a motion by the BOP Director").

reduction and was the only individual authorized by law to initiate a sentence reduction proceeding.[50]  Indeed, even the U.S. Department of Justice recognized that, before passage of the First Step Act, the BOP functionally had final say on what constituted an "extraordinary and compelling reason" for a sentence reduction because only the Director of the BOP could file an 18 U.S.C. § 3582(c)(1)(A) sentence reduction motion.[51]

The OIG found that leaving the Director of the BOP with such unilateral and unqualified authority created several problems.  Among other things, the OIG found that the BOP: (1) failed to provide adequate guidance to staff on the criteria for 18 U.S.C. § 3582(c)(1)(A) motions;  (2) failed to set timelines for the review of requests for 18 U.S.C. § 3582(c)(1)(A) motions; (3) failed to create formal procedures for informing defendants about 18 U.S.C. § 3582(c)(1)(A); and (4) failed to generate a system for tracking requests for 18 U.S.C. § 3582(c)(1)(A) motions.[52]  Thus, the OIG concluded that the "BOP does not properly manage the compassionate release program, resulting in inmates who may be eligible candidates for release not being considered."[53]

---

[50] The BOP's policies and procedures concerning 18 U.S.C. § 3582(c)(1)(A) sentence reduction motions in existence before passage of the First Step Act are found in "Program Statement 5050.49 – Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. § 3582(c)(1)(A) and U.S.C. § 4205(g)" (March 25, 2015).  *See* https://www.bop.gov/policy/progstat/5050_049_CN-1.pdf.

[51] *See* U.S. Dep't of Justice, Letter to Gilberto Hinojosa, Chairman, U.S. Sentencing Commission (July 14, 2007)(noting that because Congress authorized the BOP alone to determine which defendants to bring to a court's attention for a potential sentence reduction, "it would be senseless [for the Sentencing Commission] to issue policy statements allowing the court to grant such motions on a broader basis than the responsible agency will seek them").

[52] *See* Exhibit 10, U.S. Dep't of Justice Office of the Inspector General, The Federal Bureau of Prisons' Compassionate Release Program (Apr. 2013), at i–iv.

[53] *Id.; see also* Stephen R. Sady & Lynn Deffebach, *Second Look Resentencing Under 18 U.S.C. § 3582(c) as an Example of Bureau of Prisons Policies That Result in Overincarceration*, 21 Fed. Sent. Rptr. 167 (Feb. 2009).

---

Congress heard and acted on those complaints, passing the First Step Act in late 2018, which fundamentally transformed the process by which 18 U.S.C. § 3582(c)(1)(A) sentence reduction motions are adjudicated. In particular, district courts today can resentence a defendant "upon motion of the defendant" as long as a defendant first files a request for a sentence reduction motion with the warden of the facility in which s/he is being held that is rejected or the lapse of 30 days "from the receipt of such a request by the warden of the defendant's facility," whichever happens first.[54]

Thus, simply put, once a defendant files an 18 U.S.C. § 3582(c)(1)(A) sentence reduction motion after the occurrence of either of the two foregoing events, a district court may reduce that defendant's sentence to time served (or any other prison term short of the initial sentence) if it finds that: (1) "extraordinary and compelling reasons" exist for a sentence reduction after considering the 18 U.S.C. § 3553(a) factors; and (2) a reduced prison term is consistent with the applicable policy statements set forth in Section 1B1.13 of the Guidelines.[55]

Congress made the foregoing changes in an effort to expand the use of 18 U.S.C. § 3582(c)(1)(A) and reduce sentences that no longer serve the sentencing objectives of the federal criminal justice system. Thus, today, federal judges have the power to order sentence reductions and, in doing so, are authorized to reduce prison terms on the full array of grounds reasonably encompassed by the phrase "extraordinary and compelling reasons." Put differently, relief under

---

[54] *See* 18 U.S.C. § 3582(c)(1)(A); Beck, 2019 WL 2716505, at *5 ("Among other things, [the First Step Act] add[s] a provision allowing courts to consider motions by defendants for compassionate release without a motion by the BOP Director so long as the defendant has asked the Director to bring such a motion the Director fails or refuses").

[55] *See Beck*, 2019 WL 2716505, at *6 ("Thus, courts may, on motions by defendants, consider whether a sentence reduction is warranted for extraordinary and compelling reasons other than those specifically identified in the application notes to the old policy statement").

18 U.S.C. § 3582(c)(1)(A) is now available to *any* defendant whose conditions have changed such that a fair-minded person could conclude that "extraordinary and compelling" reasons for a sentence reduction exist.

*United States v. Cantu-Rivera,* [56] is instructive with regard to this Court's newfound authority to reduce sentences based on "extraordinary and compelling reasons." Initially, the court in *Cantu-Rivera* explained that "[t]he First Step Act of 2018 amended 18 U.S.C. § 3582(c)(1)(A) to allow district courts to modify sentences of imprisonment upon motion by the defendant if the defendant has fully exhausted all [BOP] administrative rights . . . or 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier."[57] After serving over 30 years in prison, the defendant's life sentence for Conspiracy to Distribute Cocaine was reduced to time served. The Court based this reduction principally on "the extraordinary degree of rehabilitation Mr. Cantu-Rivera has accomplished during the 30 years he has been incarcerated." Rehabilitative conduct relied on by the Court included "extensive educational achievements" such as "completion of over 4,000 hours of teaching while in federal prison to complete a Teaching Aide apprenticeship with the Department of Labor," his "service as a teaching assistant in several prison facilities for high-school equivalency and English-as-a-Second-Language programs," and "his service in the BOP's suicide 23 watch program, helping to care for inmates placed in solitary confinement due to suicide attempts."[58]

---

[56] Case No. 89-CR-204, 2019 WL 2578272 (S.D. Tex. June 24, 2019).

[57] *United States v. Cantu-Rivera*, Case No. 89-CR-204, 2019 WL 2578272, *1 (S.D. Tex. June 24, 2019) (internal quotation marks omitted).

[58] *Id.* at *2.

Similarly, in *United States v. Cantu*,[59] the court reduced that defendant's 290-month sentence (which had previously been reduced to 210 months based on Amendments 782 and 788 to the Guidelines) to time served after service of more than 14 years imprisonment based principally on his medical condition, even though he "ha[d] not presented evidence that his reasons are extraordinary and compelling under the three explicitly defined reasons" set forth in Application Note 1 to Section 1B1.13 of the Guidelines.[60]

And, in *United States v. McGraw*,[61] the court stated that the First Step Act's modification of 18 U.S.C. § 3582(c)(1)(A) "now provides an avenue for a defendant to seek a [sentence reduction directly] from the Court" and that "courts have universally turned to U.S.S.G. § 1B1.13 to provide guidance on the 'extraordinary and compelling reasons' that may warrant a sentence reduction."[62]   The Court then reduced that defendant's life sentence for Possession with Intent to Distribute Methamphetamine, of which he had served 17 years, to time served, based principally on "his serious medical conditions," even though he had a long criminal history and had occupied a "leadership" position in the Diablos motorcycle gang.[63]

---

[59] Case No. 05-CR-458, 2019 WL 2498923 (S.D. Tex. June 17, 2019).

[60] *Id.* at *3.

[61] Case No. 02-CR-00018, 2019 WL 2059488 (S.D. Ind. May 9, 2019).

[62] *United States v. McGraw*, Case No. 02-CR-00018, 2019 WL 2059488, *1(S.D. Ind. May 9, 2019).

[63] *Id.* at 2-6.

B.      Jorge and Victor Torres Have Exhausted their Administrative Remedies for the Filing of an 18 U.S.C. § 3582(c)(1)(a) Sentence Reduction Motion Directly with this Court.

On November 8, 2019, the Torres Brothers filed a request for a sentence reduction motion with the warden of the facility in which they are incarcerated, FCI Fairton in Fairton, New Jersey.[64] The Torres Brothers did not receive a response from the warden at FCI Fairton within 30 days, but ultimately their requests were denied in February 2020. Therefore, the Torres Brothers are now statutorily authorized to directly present this Court with the instant 18 U.S.C. § 3582(c)(1)(A) sentence reduction motion.

C.      Extraordinary and Compelling Reasons Support the Reduction of the Torres Brothers' Life Sentences to Time Served.

Society does not expect much from imprisoned people who receive life sentences. The Torres Brothers, however, have done the unexpected, making a difference inside and outside the prison community. The Torres Brothers have added significant value to prison society, to the lives of at-risk juveniles, and to the lives of their children and grandchildren, despite going to prison when some of their children were below the age of one. Truly, the Torres Brothers have become an extraordinary example of how incarcerated individuals can contribute to society and that people truly can change.

To date, the Torres Brothers, both non-violent, first-time offenders, have served nearly 33 years of the life sentence imposed by Judge Walker. They are not immediate-gratification, easy-way-out, immature young men in their twenties anymore. Rather, they are now educated, spiritual, hard-working contributors to society in their sixties.

---

[64] *See* Exhibit 11, Jorge compassionate release request and warden's response; *see also* Exhibit 12, Victor compassionate release request and warden's response.

i.      *The Torres Brothers are fully and unconditionally rehabilitated.*

The Torres Brothers have done everything in their power to rehabilitate themselves despite having no realistic hope of release. Their rehabilitation is demonstrated by their genuinely exceptional accomplishments and meritorious prison record. Not only are the officers at FCI Fairton in favor of the Torres Brothers' release, but so is the judge that sentenced them to life imprisonment. After nearly 33 years on the bench, the Torres Brothers' case was the first time Judge Walker supported a case for sentence reduction.[65] The people who have seen the Torres Brothers' progress first-hand believe there is no further need for their continued confinement.[66]

During their 33 years of incarceration, the Torres Brothers have completed a plethora of courses, educational programs, and life skills programs at the prison. Incredibly, in nearly 33 years, the Torres Brothers have only received a **single** disciplinary infraction for a messy cell during a time when the space was being renovated. They have exhibited no violent behavior and have been role models for fellow incarcerated individuals in their constant strides toward self-improvement and spiritual growth. This unbroken pattern of good behavior is truly remarkable because, generally speaking, people serving life without parole sentences become management problems as they have no expectation of ever being released, and, therefore, have little incentive to follow prison rules. One infraction over the course of 33 years in prison is nearly unheard of and is an exceptional achievement for anyone incarcerated in various facilities for over three decades. This factor alone demonstrates "extraordinary and compelling" character, behavior, and reasons supportive of a sentence reduction.

---

[65] *See* Exhibit Ex. 2, U.S. Circuit Judge Walker Letters at 4.

[66] *See* Exhibit 13, Jorge Bureau of Prisons Support Letters; Exhibit 14 Victor Bureau of Prisons Support Letters; Exhibit 5, Jorge Family Support Letters; Exhibit 6, Victor Family Support Letters.

ii.   *The Torres Brothers are remorseful and accept full responsibility for their actions.*

The Torres brothers are exceptional. Despite their life sentences, they are model inmates and are regularly asked to volunteer for programs that facilitate interactions between the public and the prison system. Since their first day of incarceration, the Torres Brothers have chosen to face the consequences of their actions head on, better themselves, and use their mistakes to educate their children, nieces, nephews, grandchildren, and the public.

Furthermore, the words of Jorge and Victor's families, as well as the BOP Staff who have known them for close to 30 years, evidence the tremendous impact that these convictions have already had on the brothers, the punishment they have been placing on themselves for over three decades, and the genuine remorse and regret they feel.

- "One of the greatest things about Victor is that even though he has been incarcerated for nearly 29 years, he has influenced his three children in a positive direction. His oldest son (33 yrs. old) faithfully serves as a Border Patrol Agent in Texas. His 29 years old daughter works for the TSA in Dallas, TX. And his 31 year old middle son has been diagnosed with fragile x syndrome since his birth. However, his son is eager to live and be united with his father as soon as he is released from prison."[67] (Statement of BOP Counselor, Michael C. Coard)

- "I personally witnessed and experienced how these two men thrived daily mentoring myself and other men and troubled youth through genuine thoughtfulness and caring. They are a true light within the gloom, despair and darkness of the Federal Penal System. These men are highly respected within the prison system by both the inmate population, the front line staff and the administration."[68] (Statement of former incarcerated individual, Ramon Nicolai)

---

[67] *See* Exhibit 14, Victor BOP Support Letters at 6.

[68] *See* Exhibit 5, Jorge Family Support Letters at 24-25; Exhibit 6, Victor Family Support Letters at 23-24.

We offer these and other support letters as evidence of the Torres Brothers' remorse, contrition, and acceptance of responsibility, and respectfully submit that these materials, combined with the other factors detailed herein, and the ongoing pandemic, demonstrate "extraordinary and compelling reasons" supportive of a sentence reduction.

       iii.      *The Torres Brothers are pillars in the religious community of BOP.*

With a life sentence, it is hard to see the light in the darkness. But that is what the Torres Brothers have been doing for the past 33 years – for themselves, for each other, and for those in prison around them. They have been a source of light in an extremely dark and desolate place for nearly 33 years.

Besides involvement in community-outreach mentor programs, the Torres Brothers have also been involved in their church. They are deeply pious and religious men of great faith despite residing in a place where many have lost all hope. In particular, Jorge and Victor have ascended to a leadership role within the church. They have both served in the Prison Chapel for the past 28 years. Jorge completed a number of courses through the Berean School of the Bible and is currently the Inmate Pastor of the Spanish Congregation. Victor served as the usher for the Spanish Congregation for many years, and he currently conducts bible study sessions. In a place where many people lose faith and lose themselves, the Torres Brothers have done the opposite.

According to the Federal Bureau of Prisons Chaplain at FCI Fairton, both men are dedicated to their church and unlikely to recidivate. Regarding both, the Chaplain wrote:

> [Jorge/Victor] Torres is not only a sincere Christian, he is also a great teacher. He has been conducting great bible study for many years. [He] is also very supportive of our institution when other inmates have had difficult times. Through his great example, there were many inmates who have changed their lives in a positive way. . . . [H]e is a changed and wonderful man, a great minister, and a wonderful father...I believe that he is completely ready to return to our normal community. I highly

recommend his release as soon as possible, as it is good for our nation, for him, as well as his family.[69] (Statement of BOP Chaplain Daniel D. Cho)

Regarding Victor specifically, the Chaplain wrote:

He has also served as a Suicide Companionship mentor for the last ten years. One of the greatest things about Victor is that even though he has been incarcerated for nearly 29 years, he has influenced his three children in a positive direction. . . . [H]e is a changed and wonderful man, a great minister, and a wonderful father.[70] (Statement of BOP Chaplain Daniel D. Cho)

Regarding Jorge specifically, the Chaplain wrote:

[Jorge] is the lay minister for the Spanish Service. He always serves the Lord with a faithful heart and has served as a lay minister for the past 28 years in the Prison Chapel. . . . He is also a designated translator. . . . [His wife Iris] is such a wonderful and godly woman. When her husband entered Prison, she was 25 years old, yet she has continually supported her husband for more than 28 years. Even though both of them are not physically together, they have been happily married for over 35 years.[71] (Statement of BOP Chaplain Daniel D. Cho)

iv.   *The Torres Brothers have acted in ways that far exceed merely rehabilitating themselves.*

When not involved in community outreach or their church, the Torres Brothers have worked towards general self-improvement.   While in prison, Victor received his Bachelor's Degree in Management from Park College in Parkville, Missouri, graduating *magna cum laude* with a GPA of 3.733.   Both men have also completed apprenticeships and training to become successful dental lab technicians for the federal prison system.[72]   Additionally, they have

---

[69] *See* Exhibit 13, Jorge BOP Support Letters, at 6; Exhibit 14, Victor BOP Support Letters at 11-12.

[70] *See* Exhibit 14, Victor BOP Support Letters at 11.

[71] *See* Exhibit 13, Jorge BOP Support Letters at 6.

[72] *See* Exhibit 21, Victor Accomplishments.

completed programs to develop skills ranging from accounting, to culinary arts, to repairing microwave ovens—and the list goes on.[73]

A former incarcerated individual, Ramon Nicolai, who has written a letter on behalf of Jorge and Victor Torres, noted, "My sentencing Judge the Honorable Gustavo A. Gelpi lauded me for my outstanding achievements in programming and rehabilitation over my 25 years of incarceration but my achievements pale in comparison to that of Jorge and Victor."[74] He goes further to state, "As a matter of fact[,] in the 32 years I spent behind bars I never saw such incomparable rehabilitation and dedication to changing one's life as these two men showed me."[75]

These are clear indications of men who have spent their time and talents wisely, despite having no hope of ever being released. Jorge and Victor have done everything they can with the resources at their disposal in prison to better themselves and redeem themselves. Given their track record spanning over three decades, it is clear that they will continue on this path of helping others, and, if given the opportunity, that they will be hardworking and law-abiding members of society. If released, their testimony about their experiences will do more to deter others from committing crimes than keeping them in prison ever will.

For these reasons, U.S. Circuit Judge Walker recently wrote:

In sum, in my view, the Torres' continued incarceration is not necessary to serve the needs of our criminal sentencing scheme. *See* 18 U.S.C. § 3553(2). In the more than 32 years on the bench, this is the first time that I have supported a commutation. But it is the first time that I have encountered individuals whom I

---

[73] Exhibit 7, Jorge Reentry Plan at 1-2; Exhibit 8, Victor Reentry Plan at 1-2.

[74] Exhibit 5, Jorge Family Support Letters at 24-25; Exhibit 6, Victor Family Support Letters at 23-24.

[75] Exhibit 5, Jorge Family Support Letters at 24-25; Exhibit 6, Victor Family Support Letters at 23-24.

have sentenced that have rehabilitated themselves so completely and have rejected their criminal pasts so resoundingly.[76]

Additionally, Federal Bureau of Prisons Chief Psychologist, Brian Redondo wrote:

> Based on my observations, I have a high degree of confidence in their ability to succeed outside of a controlled environment, as their growth spans various areas: psychological, spiritual, employment, education, etc. They have demonstrated sustained, exemplary behavior for close to 30 years and there is no reason to believe their actions would not translate outside of the correctional setting.[77]

Although Congress provided that rehabilitation alone cannot serve as an "extraordinary and compelling reason" for a sentence reduction, the Torres Brothers' educational and rehabilitative accomplishments are uniquely and distinctively important because they engaged in such positive activities *without* any tangible incentive other than self-improvement. Simply put, the Torres Brothers, in the face of a life sentence, assumed a positive outlook and attitude towards life, sought to improve themselves to the utmost extent possible, and were motivated to do so notwithstanding their circumstances. All of these factors combined with their age, their health, and the ongoing pandemic support a reduction of Jorge and Victor Torres' life sentences. Thus, we respectfully submit that "extraordinary and compelling reasons" exist for the reduction of Jorge and Victor Torres' life sentences.

> ### v.    *The Torres Brothers have exceptional character, even in the opinion of BOP staff at FCI Fairton.*

The Corrections Officers and other BOP staff at FCI Fairton consistently describe Jorge and Victor Torres as "model inmates" – that is, reliable, considerate, and trusted persons with integrity and positive attitudes.[78] Although these individuals may not know all the details of the

---

[76] Exhibit 2, U.S. Circuit Judge Walker Letters at 4.

[77] *See* Exhibit 15, Letter from Federal Bureau of Prisons Chief Psychologist, Brian Redondo at 2.

[78] *See generally* Exhibit 13, Jorge BOP Support Letters; Exhibit 14, Victor BOP Support Letters.

Torres Brothers' offense from nearly 33 years ago, and obviously do not have the same responsibilities as this Court, they are still law enforcement professionals who have had almost daily contact with Jorge and Victor for decades. Thus, their insights should be accorded significant weight.

Michael Coard, a Correctional Counselor at FCI Fairton, has known, worked with, and observed the Torres Brothers in 1987, when they were first arrested, and then again since 2000 when they arrived at FCI Fairton.[79]  Among other things, he said the following about the Torres Brothers:

> Jorge and Victor have always tried to influence and mentor younger inmates so they could have positive role models to look to for advice and leadership. They have always expressed genuine remorse, contrition and acceptance of responsibility for their criminal conduct. In my twenty-seven year career I have seen a lot of inmates leave and return to prison, but Jorge and Victor would never return.[80]

Mr. Coard further observed that:

> In the years I have observed and known them; with their education and vocational training they have acquired while incarcerated I am certain that if they were released into society the court system would not see any problem arise from them. Also with the experience that they have acquired with the ROPE program and their desire to continue with a similar program which they have shared with me (Project P.O.W.E.R.) lead me to believe that they would be an asset to our society when released. Therefore, I believe that they would be successful and productive law abiding citizens.[81]

All of their former employers support them and indicate their remarkable dedication and efforts throughout their time in prison. For example, Jorge has been described as an individual that goes "above what is asked" in his work and "[c]onsistently finds ways to improve [the] department

---

[79] Exhibit 13, Jorge BOP Support Letters at 4; Exhibit 14, Victor BOP Support Letters at 4.

[80] Exhibit 13, Jorge BOP Support Letters at 4; Exhibit 14, Victor BOP Support Letters at 4.

[81] Exhibit 13, Jorge BOP Support Letters at 4-5; Exhibit 14, Victor BOP Support Letters at 4-5.

as a whole."[82] Victor has received similar praise from his employers throughout the years of incarceration. Both brothers are considered stellar contributors, hard workers, and huge assets to the departments for which they have worked.

Furthermore, BOP Chaplain Daniel D. Cho, who has known Jorge and Victor Torres for years, advocated on behalf of Jorge and Victor as follows:

> [A]s a man of God myself, I know that he committed the crime in the past. However, [Jorge/Victor] is a changed and wonderful man, a great minster, and a wonderful father. I believe that he is completely ready to return to our normal community. I highly recommend his release as soon as possible, as it is good for our nation, for him, as well as his family.[83]

The opinions of BOP Staff who have known, worked with, and observed the Torres Brothers over the past 33 years are highly relevant and reflective of who they have become. It is clear they are not the same individuals who entered prison in 1987. Instead, they are extraordinary individuals with "extraordinary and compelling reasons" for a reduction in their life sentences.

> vi.     *The Torres Brothers are committed to working with at-risk-youth.*

For six years, the Torres Brothers were inmate facilitators for Reaching Out to Provide Enlightenment, R.O.P.E., a program designed to help deter youth from lifestyles that may lead to incarceration.[84]   As described by Michael Coard (the program's administrator), the R.O.P.E. Program is designed to:

> deter youth from lifestyles that may lead them to incarceration. Local youth from Pennsylvania, New Jersey and Delaware who have been identified as offenders or potential offenders visit the institution to undergo intensive program participation with R.O.P.E. facilitators. The facilitators' message clearly conveys the importance of gang awareness, drug awareness, goal setting, peer pressure management,

---

[82] Exhibit 16, Unicor Work Performance Evaluation Record of Jorge Torres (October 1, 2011 – March 31, 2012 evaluation).

[83] *See* Exhibit 13, Jorge BOP Support Letters, at 6; Exhibit 14, Victor BOP Support Letters at 6.

[84] *See* Exhibit 13, Jorge BOP Support Letters at 2; Exhibit 14, Victor BOP Support Letters at 2.

criminal lifestyle identification, conflict resolution techniques and the importance of education.[85]

State court judges order juveniles to attend this program, and Jorge and Victor were among only ten men chosen from 1,400 candidates to be inmate facilitators of this program. They were chosen in large part because of their "extraordinary achievements within the institution and model conduct."[86] They were "handpicked by staff members" at their prison to participate in this program "due to their exemplary conduct with staff and inmate alike."[87] In their capacity of inmate facilitators for R.O.P.E., the Torres Brothers regularly presented for at-risk youth. In these presentations, Jorge and Victor would describe their background, how they came to be involved in selling drugs, their criminal conduct, and their regrets. They also strongly cautioned against anyone following in their footsteps.

In addition to their achievements and model conduct, Jorge and Victor's complete rehabilitation and lack of risk for recidivism played a role in the reason staff members and counselors chose the brothers to be facilitators and mentors in this program. As one correctional counselor wrote:

> In my twenty-seven year career, I have seen a lot of inmates leave and return to prison, but Jorge and Victor would never return. In the years I have observed and known them; with their education and vocational training they have acquired while incarcerated I am certain that if they were released into society the court system would not see any problem arise from them. Also with the experience that they have acquired with the ROPE program and their desire to continue with a similar program which they have shared with me (Project P.O.W.E.R.) lead me to believe that they would be an asset to our society when released. Therefore, I believe that

---

[85] *See* Exhibit 13, Jorge BOP Support Letters at 2; Exhibit 14, Victor BOP Support Letters at 2.

[86] *See* Exhibit 13, Jorge BOP Support Letters at 2; Exhibit 14, Victor BOP Support Letters at 2.

[87] *See* Exhibit 13, Jorge BOP Support Letters at 4; Exhibit 14, Victor BOP Support Letters at 4.

they would be successful and productive law-abiding citizens.[88] (Statement of BOP counselor Michael C. Coard)

Response to the Torres Brothers' R.O.P.E. Program presentations has been nothing short of extraordinary. They received dozens of letters (some of which are collected under Exhibits 17 and 18) from the at-risk youth with whom he spoke, who wrote (among other things):

- "In particular I would like to thank Jorge Torres and Victor Torres. Unfortunately, they are a living testimony that ones actions will eventually catch up to you. After leaving your program, juveniles often ask about them. I have seen juveniles with CDS offenses who thought they were 'untouchable' and that dealing with CDS was a normal way of life. After attending your program and talking to one or both Torres brothers, these same juveniles vowed to end their involvement in CDS."[89] (Statement of Superior Court of New Jersey Probation Officer Aseem Reid)

- "Jorge and Victor add a positive and vital message to your program. Their testimonies are tragic, powerful and effective. They, as well as the other R.O.P.E. members, have indirectly taken on the most important and difficult task of helping to raise and guide our children. They should be commended. I personally thank Jorge Torres, Victor Torres, and all other program members and coordinators for not giving up on our children."[90] (Statement of Superior Court of New Jersey Probation Officer Aseem Reid)

The R.O.P.E. Program is successful in large part because of the Torres Brothers' dedication and strength of character.

In addition to their work as R.O.P.E. Program facilitators, Jorge and Victor have also created a detailed reentry plan for Project P.O.W.E.R. ("Presenting Opportunity While Embracing

---

[88] Exhibit 13, Jorge BOP Support Letters at 4-5; Exhibit 14, Victor BOP Support Letters at 4-5.

[89] Exhibit 17, Jorge R.O.P.E. Support Documents, at 7; see also Exhibit 18, Victor R.O.P.E. Support Documents, at 8.

[90] Exhibit 17, Jorge R.O.P.E. Support Documents, at 7-8; see also Exhibit 18, Victor R.O.P.E. Support Documents, at 8-9.

Restoration"), a nonprofit organization modeled after R.O.P.E., which they hope to implement in their communities, if released.[91]

The Torres Brothers are not required to participate in the R.O.P.E. Program or to create programs to implement if released, especially because they are serving life sentences with little to no hope of release. However, they do so because they have sought to become better people behind bars, which is blindingly evident when looking at all of their accomplishments while incarcerated.[92]  Moreover, they have dedicated themselves to giving back to the community in which they live – even if that means from prison. These actions, efforts, and contributions are what set the Torres Brothers apart from other incarcerated persons and other "lifers." The Torres Brothers' participation and leadership roles in the prison programs at FCI Fairton, combined with the other factors detailed herein, including their age, medical condition, and the ongoing COVID-19 pandemic, all demonstrate "extraordinary and compelling reasons" supportive of a sentence reduction.

>    D.    The COVID-9 Outbreak Presents a Compelling and Extraordinary Circumstance that Warrants Compassionate Release for the Torres Brothers, Who are at Risk.

On March 11, 2020, the World Health Organization ("WHO") officially classified the new strain of coronavirus, COVID-19, as a pandemic.[93]  As of March 30, 2020, COVID-19 has infected at least 750,000 worldwide, leading to over 35,000 deaths.[94]  In the United States, approximately

---

[91] Exhibit 19, P.O.W.E.R. Brochure.

[92] *See generally*, Exhibit 20 Victor Accomplishments.

[93] "WHO Characterizes COVID-19 as a Pandemic," World Health Organization (March 11, 2020), available at https://bit.ly/2W8dwpS.

[94] "Coronavirus Map: Tracking the Global Outbreak," *New York Times* (March 25, 2020), available at https://www.nytimes.com/interactive/2020/world/coronavirus-maps.html?action=click&pgtype=Article&state=default&module=styln-coronavirus&variant=show&region=TOP_BANNER&context=storyline_menu?action=click&p

162,000 have been infected, leading to 2,874 deaths.[95] These numbers are increasing every minute and certainly underrepresent the true scope of the crisis as test kits in the United States have been inadequate to meet demand. Experts anticipate that it may kill 200,000 Americans and infect many more.[96] Currently, there is no approved cure, treatment, or vaccine.[97]

New York has been labeled the new "epicenter" of the pandemic worldwide.[98] As of April 2, 2020, there were more than 83,000 cases in New York and at least 1,940 deaths.[99] New York health officials estimate that the number of hospitalizations in the state will double every two days over the course of the next two to three weeks.[100] New York's cases of COVID-19 now represent 45 percent of the cases in the United States and over 8 percent of the cases worldwide.[101] New

---

gtype=Article&state=default&module=styln-coronavirus&variant=show&region=TOP_BANNER&context=storyline_menu.

[95] *Id.*

[96] Bobby Allyn, *Fauci Estimates that 100,000 to 200,000 Americans Could Die From the Coronavirus*, National Public Radio (Mar. 29, 2020), https://www.npr.org/sections/coronavirus-live-updates/2020/03/29/823517467/fauci-estimates-that-100-000-to-200-000-americans-could-die-from-the-coronavirus.

[97] *See* Pien Huang, *How the Novel Coronavirus and the Flu are Alike . . . And Different, National Public Radio* (Mar. 20, 2020), https://www.npr.org/sections/goatsandsoda/2020/03/20/815408287/how-the-novel-coronavirus-and-the-flue-are-alike-and-different.

[98] New York Becomes 'Epicenter' of Coronavirus Pandemic, *Politico New York Health Care* (March 25, 2020), available at https://www.politico.com/states/new-york/newsletters/politico-new-york-health-care/2020/03/25/new-york-becomes-epicenter-of-coronavirus-pandemic-333669.

[99] "Coronavirus Map: Tracking the Global Outbreak," *New York Times* (March 28, 2020).

[100] *Id.*

[101] *Id.*

---

Jersey is not far behind. As of April 2, 2020, New Jersey has over 22,000 cases and 355 deaths.[102] New Jersey currently has the second highest number of COVID-19 cases, second only to New York.[103]

On March 13, 2020, the White House declared a national emergency under Section 319 of the Public Health Service Act, 42 U.S.C. § 247(d)).[104] On March 16, 2020, the White House issued guidance recommending that, for the next eight weeks, gatherings of ten persons or more be canceled or postponed.[105] On March 20, 2020, Governor Andrew Cuomo ordered 100 percent of all non-essential workers to remain home, effectively shuttering New York's entire economy.[106] These drastic measures followed the issuance of a report by British epidemiologists, concluding from emerging data that 2.2 million Americans could die without drastic intervention to slow the global spread of the deadly virus.[107]

The Centers for Disease Control and Prevention ("CDC") have also issued guidance related to the deadly effects of COVID-19 on certain high-risk patients of the population. The CDC

---

[102] *Id.*

[103] *Id.*

[104] The White House, Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak (March 13, 2020), available at https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/.

[105] Sheri Fink, "White House Takes New Line After Dire Report on Death Toll," *New York Times* (March 17, 2020), available at https://www.nytimes.com/2020/03/16/us/coronavirus-fatality-rate-white-house.html.

[106] Keshia Clukey and Henry Goldman, "Cuomo Orders 100% of Nonessential N.Y. Workforce to Stay Home," *Bloomberg News* (March 20, 2020), available at https://www.bloomberg.com/news/articles/2020-03-20/n-y-gov-cuomo-100-percent-of-workforce-must-stay-home.

[107] Fink, "White House Takes New Line After Dire Report on Death Toll," *New York Times.*

---

identified the population most at risk of death from the disease to include older adults with chronic medical conditions, such as lung disease, heart disease, and diabetes.[108] For these individuals, the CDC warned to take immediate preventative actions, including avoiding crowded areas and staying at home as much as possible. *Id*.

E.   The Conditions of BOP Incarceration Foster the Spread of COVID-19, and Jorge and Victor Torres' Age and Current Medical Conditions Render Them Particularly Susceptible to an Unreasonable Risk of Death and an Inability to Take Preventative Measures or Self-care Recommended by the CDC.

With New York at the "epicenter" of the COVID-19 pandemic, and New Jersey close behind, it is only a matter of time before COVID-19 finds its way into FCI Fairton, where the Torres Brothers are housed. Conditions of confinement at FCI Fairton create an optimal environment for the transmission of the highly contagious virus.[109] People who work in the facility leave and return daily; people deliver supplies to the facility daily; and imprisoned people were having social, legal, and medical visits regularly prior to the BOP's decision to stop visits for 30 days starting on March 13, 2020.[110] Public health experts are unanimous in their opinion that incarcerated individuals "are at special risk of infection, given their living situations" and "may also be less able to participate in proactive measures to keep themselves safe," and "infection

---

[108] "People Who Are At Higher Risk For Severe Illness," CDC (March 26, 2020), available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fspecific-groups%2Fhigh-risk-complications.html.

[109] Joseph A. Bick, "Infection Control in Jails and Prisons," *Clinical Infectious Diseases* 45(8): 1047-1055 (2007), available at https://doi.org/10.1086/521910.

[110] "Federal Bureau of Prisons Covid-19 Action Plan," available at https://www.bop.gov/resources/news/20200313_covid-19.jsp; *see also* Exhibit 1, Affidavit of Dr. Brie Williams.

---

control is challenging in these settings."[111] The risk of coronavirus to incarcerated seniors is high. "Their advanced age, coupled with the challenges of practicing even the most basic disease prevention measures in prison, is a potentially lethal combination."[112]

The Torres Brothers are powerless to take the preventative self-care measures directed by the CDC for their high-risk group to remain safe from the COVID-19 infection. They cannot self-quarantine or partake in "social distancing" in the prison facility. They are housed in pairs with a common washroom among various people. Furthermore, there are also community spaces where incarcerated persons and prison staff gather, including a common room, laundry facilities, barbershop, religious services, medical areas, dining hall, small library, and a gym. These high-density areas are precisely the kind of spaces that have caused the alarmingly high-spread rates of COVID-19 in New York City.[113] Hand sanitizer, an effective disinfectant recommended by the CDC to reduce transmission rates, is contraband in jails and prisons because of its alcohol content.[114] Correctional health experts worry that no matter what precautions are taken by crowded prisons, these facilities may become incubators for the COVID-19 disease.[115]

---

[111] "Achieving a Fair and Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States" (March 2, 2020), at https://bit.ly/2W9V6oS.

[112] *See* Exhibit 1, Dr. Brie Williams Affidavit at 4.

[113] "White House Tells Travelers from New York to Isolate as City Cases Soar," *New York Times* (March 24, 2020), available at https://www.nytimes.com/2020/03/24/nyregion/coronavirus-new-york-update.html.

[114] Keri Blakinger and Beth Schwarzapfel, "How Can Prisons Contain Coronavirus When Purell is Contraband?," *ABA Journal* (March 13, 2020), available at https://www.abajournal.com/news/article/when-purell-is-contraband-how-can-prisons-contain-coronavirus.

[115] Michael Kaste, "Prisons and Jails Worry About Becoming Coronavirus 'Incubators'," *NPR* (March 13, 2020), available at https://www.npr.org/2020/03/13/815002735/prisons-and-jails-worry-about-becoming-coronavirus-incubators.

---

During the H1N1 epidemic in 2009, many jails and prisons dealt with high numbers of cases because they could not maintain the level of separation and sanitation necessary to prevent widespread infection.[116]   The Prison Policy Initiative has called on American jails and prisons to release medically fragile and older adults, noting that these persons are at high risk for serious complications and even death from COVID-19.[117]   Similarly, members of Congress have written to the BOP to urge that efforts be made to allow immediate release of non-violent, elderly persons.[118] The Coronavirus Aid, Relief, and Economic Security (CARES) Act, enacted on March 27, 2020, allows the Attorney General to expand the BOP's ability to move prisoners to home confinement.[119] This came after Attorney General William Barr requested that the BOP use its statutory authority to release certain people to home confinement as there are some at-risk individuals who are non-violent and pose minimal likelihood of recidivism that would be safer if released.[120]

---

[116] "Prisons and Jails are Vulnerable to COVID-19 Outbreaks," *The Verge* (Mar. 7, 2020), available at https://bit.ly/2TNcNZY.

[117] Peter Wagner & Emily Widra, "No Need to Wait For Pandemics: The Public Health Case for Criminal Justice Reform," *Prison Policy Initiative* (March 6, 2020), available at https://www.prisonpolicy.org/blog/2020/03/06/pandemic.

[118] Letter of Representatives Jerrold Nadler and Karen Bass (March 19, 2020) ("DOJ and BOP must also do all they can to release as many people as possible who are currently behind bars and at risk of getting sick. Pursuant to 18 U.S.C. 3582(c)(1)(A), the Director of the Bureau of Prisons may move the court to reduce an inmate's term of imprisonment for "extraordinary and compelling reasons.").

[119] *See* Coronavirus Aid, Relief, and Economic Security (CARES) Act, Pub. L. No. 116-136, § 12003(b)(2) (2020).

[120] Memo. From Attorney Gen. William Barr to Director of BOP, *Prioritization of Home Confinement Appropriate in Response to COVID-19 Pandemic* (Mar. 26, 2020), at https://www.politico.com/f/?id=00000171-1826-d4a1-ad77-fda671420000.

---

Jorge Torres is 63 (turning 64 in July) and Victor Torres is 59 (turning 60 in October). Jorge Torres suffered a stroke in 2018 and currently suffers from high blood pressure, arthritis, and diabetes. Diabetes is one of the chronic conditions the CDC has stated puts individuals at higher-risk for contracting COVID-19.[121] Specifically, early research shows that the mortality rate of those with diabetes that contract the virus are more than twice as high as overall mortality.[122] The preliminary overall fatality rate in an early report done by the World Health Organization was 3.8%, while the fatality rate for people with diabetes was 9.2%.[123] This research is focused on the non-prison population and becomes even more concerning when considered in the prison context. Furthermore, the brothers' mother and two sisters suffer from Alzheimer's, and Jorge has been showing early signs of memory loss.[124] Victor Torres suffers from arthritis and gall bladder stones, which cause extreme pain, and his pain has been exacerbated by the stress of the ongoing pandemic.

Jorge and Victor are the non-violent, older incarcerated people with preexisting medical conditions that officials are urging be released. Given the unparalleled and ongoing health crisis, compelling and extraordinary circumstances exist to support compassionate release more than ever before at this unique time in our country's history.[125] The BOP cannot adequately protect the

---

[121] *See* Exhibit 1, Affidavit of Dr. Brie Williams at 4.

[122] *See Report of the WHO-China Joint Mission on Coronavirus Disease 2019 (COVID-19)*, World Health Organization (Feb. 24, 2020), at 12, https://www.who.int/docs/default-source/coronaviruse/who-china-joint-mission-on-covid-19-final-report.pdf.

[123] *Id.*

[124] *See generally* Exhibit 21, Jorge Medical Records (These are all of the medical records counsel has at this time, but is requesting more and will supplement the medical records if permitted by the Court).

[125] *See Xochihua-James v. Barr*, No. 18-71460 (9th Cir. Mar. 23, 2020) (unpublished) (*sua sponte* releasing detainee from immigration detention "[I]n light of the rapidly escalating public health

Torres Brothers from infection, especially in light of their vulnerability and the rapid, and

underreported, spread of COVID-19 already taking place in our prison system. There is an urgent

crisis"); *United States v. Jeremy Rodriguez*, 2:03-cr-0027-AB-1 (E.D. Pa. April 1, 2020) (finding the following, when considered together, amounted to "extraordinary and compelling reasons" to reduce the defendant's sentence to time served after serving seventeen years: the defendant's underlying health condition (diabetes); the danger of prisons in the midst of COVID-19; the defendant's proximity to release; and the commendable rehabilitation shown by the defendant during his seventeen years in prison); *United States v. Selna*, 8:16-cr-76-JVS (C.D. Cal. Mar. 26, 2020) ("Michaels has demonstrated that the Covid-19 virus and its effects in California constitute 'another compelling reason'" justifying temporary release under § 3142(i).). *United States v. Jaffee*, No. 19-cr-88 (D.D.C. Mar. 26, 2020) (releasing defendant with criminal history in gun & drug case, citing "palpable" risk of spread in jail and "real" risk of "overburdening the jail's healthcare resources"; "the Court is . . . convinced that incarcerating the defendant while the current COVID-19 crisis continues to expand poses a greater risk to community safety than posed by Defendant's release to home confinement"); *United States v. Harris*, No. 19-cr-356 (D.D.C. Mar. 26, 2020) ("The Court is convinced that incarcerating Defendant while the current COVID-19 crisis continues to expand poses a far greater risk to community safety than the risk posed by Defendant's release to home confinement on . . . strict conditions."); *United States v Garlock*, No. 18-CR-00418-VC-1, 2020 WL 1439980, at *1 (N.D. Cal. Mar. 25, 2020) (citing "chaos" inside federal prisons in sua sponte extending time to self-surrender: "[b]y now it almost goes without saying that we should not be adding to the prison population during the COVID-19 pandemic if it can be avoided"); *United States v. Perez*, No. 19 CR. 297 (PAE), 2020 WL 1329225, at *1 (S.D.N.Y. Mar. 19, 2020) (releasing defendant due to the "heightened risk of dangerous complications should he contract COVID-19"); *United States v. Stephens*, 2020 WL 1295155, __F. Supp. 3d__ (S.D.N.Y. Mar. 19, 2020) (releasing defendant in light of "the unprecedented and extraordinarily dangerous nature of the COVID-19 pandemic"); *In re Manrigue*, 2020 WL 1307109 (N.D. Cal. Mar. 19, 2020) ("The risk that this vulnerable person will contract COVID-19 while in jail is a special circumstance that warrants bail."); *In re Request to Commute or Suspend County Jail Sentences*, Docket No. 084230 (N.J. Mar. 22, 2020) (releasing large class of defendants serving time in county jail "in light of the Public Health Emergency" caused by COVID-19); *see also United States v. Avenatti*, No. 8:19-cr-61 (C.D. Cal. Mar. 25, 2020) (sua sponte inviting defendant to move for reconsideration of a just-denied motion for release "[i]n light of the evolving nature of the Covid-19 pandemic"); *United States v. Matthaei*, No. 1:19-CV-00243-BLW, 2020 WL 1443227, at *1 (D. Idaho Mar. 16, 2020) (extending self-surrender date by 90 days in light of COVID-19); *United States v. Barkman*, 2020 U.S. Dist. LEXIS 45628 (D. Nev. Mar. 17, 2020) (suspending intermittent confinement because "[t]here is a pandemic that poses a direct risk if Mr. Barkman . . . is admitted to the inmate population of the Wahoe County Detention Facility"); *United States v. Copeland,* No. 2:05-cr-135-DCN (D.S.C. Mar. 24, 2020) (granting compassionate release to defendant in part due to "Congress's desire for courts to release individuals the age defendant is, with the ailments that defendant has during this current pandemic").

need to act now, before the life-threatening virus spreads within the prison and the Torres Brothers become infected.

In summary, the COVID-19 virus is highly transmissible, extraordinarily dangerous, and poses a severe threat of death to the high-risk, older inmates with pre-existing medical conditions. The Torres Brothers fit into this high-risk category. The conditions at FCI Fairton do not allow them to take the self-care measures required by the CDC to protect their safety. Releasing the Torres Brothers will only benefit the prison system by minimizing the number of incarcerated people in need of protection from COVID-19.

F.  The Relevant 3553(a) Factors Including the Torres Brothers' Release Plan Favor Resentencing.

When extraordinary and compelling reasons are established, the Court must consider the relevant sentencing factors in § 3553(a) to determine whether a sentencing reduction is warranted pursuant to 18 U.S.C. § 3582(c)(1)(A)(i).

i.  *The Torres Brothers have a realistic release plan that takes into account the time needed to transition back into society.*

In this case, a review of the § 3553(a) factors, and their release plans, favor granting the Torres Brothers compassionate release. Upon release, both brothers intend to move to Philadelphia, Pennsylvania. Jorge Torres will relocate to Philadelphia to live with his niece, Joanna Lebron. Victor Torres will relocate to Philadelphia to live with his sister, Minerva Torres Lebron. Furthermore, the Torres Brothers' 97 year old mother lives in Philadelphia, and while rebuilding their own personal lives, both men hope to be close to their mother during her final years. While both men are eager to begin working, they understand the realities of reentering society after three decades in prison. During their incarceration, even with the understanding that they were serving life sentences and would never be released, the Torres Brothers have consistently worked on bettering themselves and learning various life skills. This has provided them with

invaluable skillsets that will allow for gainful employment. Moreover, the Torres Brothers have a long line of people waiting to support and help integrate them back into society.

Furthermore, their behavior, efforts, lack of a disciplinary record, and good acts over the last 33 years prove that, if released, they will not pose a threat to their community or reoffend. Instead, Jorge and Victor Torres will take everything they have learned over the past 33 years in prison, including their education and varied skillsets, to become productive members of their communities. These facts, coupled with the remaining § 3553(a) factors, favor reducing the Torres Brothers' sentence to time-served under compassionate release.

     *ii.     Releasing the Torres Brothers does not diminish the seriousness of their offense.*

First, their offense conduct, while concededly serious, did not involve violence. This was Jorge's first and only arrest, and Victor had an expunged record in Puerto Rico.[126] Both men came to prison as young, immature adults, and Jorge and Victor will exit, if this Honorable Court will allow, as educated, mature, and atoned family men. They have contributed to society and to those struggling to make the right decision while in prison, and they intend to initiate a similar program in their communities upon release. After serving three decades in prison, releasing the Torres Brothers under compassionate release, coupled with all of their accomplishments and the ongoing pandemic, does nothing to diminish the seriousness of their offense – one they have spent 33 years in prison regretting and atoning for.

     *iii.     The Torres Brothers' advancing age and medical conditions favor their release especially in light of the ongoing COVID-19 pandemic.*

The Torres Brothers' advancing age and medical conditions have worsened over time, and they are now at high risk for COVID-19. Jorge Torres has been prescribed Lisinopril (5 mg) for

---

[126] *See* Exhibit 3, Jorge PSR at 2; Exhibit 4, Victor PSR at 2.

his high blood pressure, Atravastation (40 mg) to unclog his veins, Aspirin (81 mg) to thin his blood, Metformin (500 mg) for his diabetes, and he manages his arthritis without medication. As mentioned above, he previously suffered a stroke while incarcerated.[127] Victor Torres manages his arthritis and gall bladder stones on his own, and he is currently not on any medication.[128] However, Jorge is in his early 60s, and Victor will be 60 this year, and as they continue to age, their health will continue to decline.

Their advancing age and current health conditions in the midst of the COVID-19 crisis are sufficient extraordinary and compelling reasons for the Court to conclude that their personal history and characteristics favor resentencing – and ultimately release – under the § 3553(a) factors.

   iv.   *The Torres Brothers' sentence is disproportionate to those of other large-scale conspiracy cases and to all of their former co-defendants.*

The remaining § 3553(a) factors favor release for the Torres Brothers. They have served almost 33 years in prison. One key sentencing factor stressed by Congress in 18 U.S.C. § 3553(a) is "the need to avoid unwarranted sentence disparities" among similarly situated defendants. The Torres Brothers' crime was serious. In retrospect, however, it is clear that the punishment presently imposed on them, *life without parole*, is disproportionately severe compared to the sentences received by leaders of major drug trafficking organizations. The following examples illustrate this argument:

- The Arellano-Felix Drug Organization ("AFO") was "once among the world's most violent and powerful multi-national drug trafficking organizations."[129] The AFO

---

[127] *See* Exhibit 11, Jorge compassionate release request and warden's response at 3.

[128] *See* Exhibit 12, Victor compassionate release request and warden's response at 3.

[129] *See, e.g.*, FBI, "Last of the Arellano-Felix Brothers Sentenced" (Aug. 19, 2013), available at https://www.fbi.gov/sandiego/press-releases/2013/last-of-the-arellano-felix-brothers-sentenced (last accessed March 31, 2020).

was responsible for moving hundreds of tons of cocaine and marijuana from Mexico and Colombia into the United States.[130] The organization terrorized the southwest United States border with executions, torture, beheadings, kidnappings, and bribes to law enforcement.[131] In 2013, Eduardo Arellano-Felix, who acted as the chief financial officer of the organization was sentenced to 15 years in federal prison.[132] His brother Benjamin, also an organization leader, was previously sentenced to 25 years in federal prison. The third brother and primary leader of the organization, Javier, was sentenced to life in prison.[133]

- Osiel Cardenas-Guillen was the former head of the Gulf Cartel. The Gulf Cartel was responsible for importing thousands of kilograms of cocaine into the United States from Mexico and using violence and intimidation to further the goals of the criminal enterprise. In 2010, Cardenas-Guillen was sentenced to 25 years in federal prison.[134]

- George Jung was responsible for 85% of the cocaine smuggled into the United States in the 1970s and 1980s and was released from federal prison in 2014 after serving approximately 20 years.[135] He was originally sentenced to 60 years but received a reduction based on cooperation.[136]

- Finally, Griselda Blanco, known as the Cocaine Godmother and the Queen of Cocaine, was a drug lord of the Medellín Cartel and a pioneer in the Miami-based cocaine drug trade and underworld during the 1970s and early 1980s.[137] In addition to moving tons of cocaine into the United States, Blanco was responsible for

---

[130] *Id.*

[131] *Id.*

[132] *Id.*

[133] *Id.*

[134] *See, e.g.*, FBI, "Osiel Cardenas-Guillen, Former Head of the Gulf Cartel, Sentenced to 25 Years' Imprisonment" (Feb. 24, 2010), https://archives.fbi.gov/archives/houston/press-releases/2010/ho022410b.htm (last accessed March 31, 2020).

[135] *See, e.g.*, CBS, "Notorious Ex-Cocaine Kingpin George Jung Out of Prison, Living in San Francisco" (June 3, 2014), available at http://sanfrancisco.cbslocal.com/2014/06/03/notorious-ex-cocaine-kingpin-george-jung-out-of-prison-living-in-san-francisco/ (last accessed March 31, 2020).

[136] *Id.*

[137] *See, e.g.*, CBS, "The Hunt for the 'Cocaine Godmother'" (Sept. 27, 2012), *available at* http://miami.cbslocal.com/2012/09/27/the-hunt-for-the-cocaine-godmother/ (last accessed March 31, 2020).

---

ordering several drug-related murders.[138] In 1988, she was sentenced to 15 years in federal prison.[139]

Not only are Jorge's and Victor's sentences proven disproportionately severe when compared with the sentences received by these notorious and violent drug kingpins, they are also starkly disproportionate to the sentences received by their twelve co-defendants, all of whom have now been released. Using the limited information available to search for the co-defendants on the BOP's inmate database, it is believed that the last co-defendant was released at least four years ago, and at least one co-defendant, Efrain Arcelay, was released over twenty years ago.[140]

The overview of other conspiracy cases above outlines the severe disproportionate nature of the Torres Brothers' sentences. Jorge and Victor's life sentences are now significantly out-of-line with those of their co-defendants, as well. A reduction of their sentence is therefore needed to "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."

> v.      After 33 years in prison, the sentencing goal of deterrence has been met.

After nearly 33 years in prison, there is no further need served by the Torres Brothers remaining confined. Over three decades is sufficient to deter the public, and it has clearly been sufficient to punish Jorge and Victor. The Torres Brothers are not a threat to the public. If we allow the justice system to work as it should, the Torres Brothers can be the example of incarcerated individuals serving a significantly lengthy sentence and successfully contributing to

---

[138] *Id.*; *see also* Biography.com, "Griselda Blanco Biography," available at http://www.biography.com/people/griselda-blanco-20965407 (last accessed March 31, 2020) (noting that Blanco was a named suspect in more than 200 murders).

[139] *Id.*

[140] Two co-defendants, Nelson Flores and Fernando Padron, passed away while incarcerated. The rest appear to be released based on a search on the BOP website.

society upon their release.  Most importantly,  Judge Walker, their 1988 sentencing judge, believes that further detainment is unnecessary at this time:

> In sum, in my view, the Torres' continued incarceration is not necessary to serve the needs of our criminal sentencing scheme. *See* 18 U.S.C. § 3553(2).  In the more than 32 years on the bench, this is the first time that I have supported a commutation.  But it is the first time that I have encountered individuals whom I have sentenced that have rehabilitated themselves so completely and have rejected their criminal pasts so resoundingly.[141]

The Torres Brothers' offense conduct was serious, and they still have a life sentence hanging over their heads.  However, the circumstances from 1988 have changed drastically. Moreover, the circumstances in the last 30 days have changed, and will continue to change, as each day goes by.  There is no more time to waste, and the Torres Brothers certainly do not have time to waste.

The government cannot dispute that the Torres Brothers are model prisoners, are not a danger to society, and are advancing in their age.  Furthermore, it cannot be disputed that, based on both brothers' compromised health as outlined above, they are in grave physical danger facing the current pandemic.  The government also cannot guarantee, or provide any sense of confidence, that this widespread virus will not make its way inside the doors of the federal facility in Fairton, as it has already made its way into so many other prison facilities.  If the virus spreads inside that prison, it could kill one or both of the Torres Brothers.  The Court, in sentencing the Torres Brothers in 1988, intended to give them life sentences – but not death sentences.  If nothing is done, that is quite possibly the new outcome for the Torres Brothers.  Even before this unparalleled pandemic, Judge Walker determined the Torres Brothers had served enough years behind bars. We are respectfully asking this Court to also find they are worthy of release.

---

[141] Exhibit 2, U.S. Circuit Judge Walker Letter at 4.

> vi.   *There is nothing to gain with the continued incarceration of Jorge and Victor Torres.*

While there is nothing to gain, there is much to be lost by the Torres Brothers' continued incarceration. They are perfect examples of who incarcerated individuals should aspire to be. They are rehabilitated to the fullest extent, have maintained strong ties to their families in the last 33 years, have educated themselves multiple times over, have participated in nearly all programs offered within the prison facility, and they have plans to incorporate a rehabilitation program into their communities. They are in their early 60s, have collectively already suffered a stroke, high blood pressure, diabetes, or gall bladder stones, and now they await the almost certain outbreak of COVID-19 within FCI Fairton.

Releasing the Torres Brothers would fulfill Congress' intent in offering courts greater flexibility to reduce sentences when changed circumstances justify a later review. This ongoing pandemic is a changed circumstance no one could have ever predicted, but so is Jorge and Victor's progress, rehabilitation, and post-incarceration conduct. The Torres Brothers' health conditions, their increasing age, their post-incarceration conduct, and the rapidly advancing COVID-19 outbreak, together with the prison's inflexibility to provide them the ability to take self-care measures directed by the CDC to remain safe during the outbreak, warrants a reduced sentence in their case.

## V.   CONCLUSION

For the foregoing reasons, the Torres Brothers respectfully request that the Court grant a reduction in their sentence to time served under these unprecedented and unpredictable conditions presented in the midst of the ongoing COVID-19 pandemic.

Respectfully submitted,


BELL NUNNALLY & MARTIN LLP

By: _/s/ Arianna Goodman_
    Arianna Goodman
    agoodman@bellnunnally.com
    Texas Bar No. 24109938
    Jeff Ansley
    jansley@bellnunnally.com
    Texas Bar No. 00790235
    Katherine Devlin (pro hac pending)
    kdevlin@bellnunnally.com
    Texas Bar No. 24094372
    2323 Ross Avenue, Suite 1900
    Dallas, Texas 75201
    (214) 740-1400 Telephone


BURIED ALIVE PROJECT

By: _/s/ Brittany Barnett_
    Brittany K. Barnett (pro hac pending)
    brittany@buriedaliveproject.org
    Texas Bar No. 24078196
    3131 McKinney Avenue, Suite 600
    Dallas, Texas 75204
    (214) 919-4421 Telephone


**ATTORNEYS FOR JORGE AND VICTOR TORRES**